1
2
3
4
5          IN THE UNITED STATES DISTRICT COURT
6              FOR THE DISTRICT OF ARIZONA
7
8   Martin Bayze,                        )   No. CV 12-768-TUC-CKJ (CRP)
                                         )
9          Plaintiff,                    )   **REPORT & RECOMMENDATION**
                                         )
   vs.                                   )
10                                       )
                                         )
11  Carolyn W. Colvin, Acting Commissioner)
    of the Social Security Administration,)
12                                       )
           Defendant.                    )
13                                       )
   _____)
14

15         Plaintiff has filed the instant action seeking review of the final decision of the

16  Commissioner of Social Security pursuant to 42 U.S.C. § 405(g). Pending before the Court

17  are Plaintiff's Opening Brief (Doc. 20) ("Plaintiff's Brief"), Defendant's Opposition to

18  Plaintiff's Opening Brief (Doc. 23) ("Defendant's Brief"), and Plaintiff's Reply (Doc, 28).

19  For the following reasons, the Magistrate Judge recommends that the District Court, after its

20  independent review, remand this matter for an immediate award of benefits.

21  **BACKGROUND**

22         In August 2006, Plaintiff filed applications for disability insurance benefits and

23  supplemental social security income under the Social Security Act.  (Administrative Record

24  ("AR.") 324-35). Plaintiff, was born in 1964 and completed high school enrolled in special

25  education classes.  (AR. 58-59, 324, 519-23, 324).  He worked from 1981 to 2006 as a

26  painter, and also worked as a delivery man in 1996. (AR. 373).  Plaintiff alleges he has been

27  unable to work since January 1, 2006 due to psychosis, concentration problems, learning

28  disability which makes it difficult for him to retain new information and struggle with

1   reading and writing, arthritis in his right shoulder and arm, pain in his neck and upper back,

2   bipolar disorder, and "he constantly hears whispers that demean him...[ which] makes it

3   extremely difficult for him to concentrate on jobs." (AR.. 372). Plaintiff's application was

4   denied initially and on reconsideration, after which Plaintiff requested a hearing before an

5   administrative law judge ("ALJ"), who, subsequent to the hearing, concluded Plaintiff was

6   not disabled. (AR. 46-87, 137-38, 145-58, 182). Upon Plaintiff's request for review, the

7   Appeals Council remanded the matter to the ALJ for additional fact finding. (AR. 159-62,

8   206-07). On April 1, 2011, after two additional hearings, the ALJ issued her decision finding

9   Plaintiff was not disabled. (AR. 25-37, 88-125, 126-36). Thereafter, the Appeals Council

10   denied Plaintiff's request for review (AR. 1-5), rendering the ALJ's April 1, 2011 decision

11   the final decision of the Commissioner.

12       Plaintiff then initiated the instant action, raising two grounds for relief: (1) the ALJ's

13   improper rejection of treating and examining sources resulted in a residual functional

14   capacity assessment that did not include all of Plaintiff's impairments; and (2) the ALJ failed

15   to apply the proper legal standard when assessing Plaintiff's credibility.

16   **STANDARD**

17       The Court has the "power to enter, upon the pleadings and transcript of the record, a

18   judgment affirming, modifying, or reversing the decision of the Commissioner of Social

19   Security, with or without remanding the cause for a rehearing." 42 U.S.C. §405(g). The

20   factual findings of the Commissioner shall be conclusive so long as they are based upon

21   substantial evidence and there is no legal error. 42 U.S.C. §§ 405(g), 1383(c)(3); *Tommasetti*

22   *v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008). This Court may "set aside the

23   Commissioner's denial of disability insurance benefits when the ALJ's findings are based

24   on legal error or are not supported by substantial evidence in the record as a whole." *Tackett*

25   *v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999) (citations omitted).

26       Substantial evidence is "'more than a mere scintilla[,] but not necessarily a

27   preponderance.'" *Tommasetti*, 533 F.3d at 1038 (quoting *Connett v. Barnhart*, 340 F.3d 871,

28   873 (9th Cir. 2003)); *see also Tackett*, 180 F.3d at 1098. Further, substantial evidence is

1 "such relevant evidence as a reasonable mind might accept as adequate to support a

2 conclusion." *Parra v. Astrue*, 481 F.3d 742, 746 (9th Cir. 2007).  Where "the evidence can

3 support either outcome, the court may not substitute its judgment for that of the ALJ."

4 *Tackett*, 180 F.3d at 1098 (*citing Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992)).

5 Moreover, the Commissioner, not the court, is charged with the duty to weigh the evidence,

6 resolve material conflicts in the evidence and determine the case accordingly. *Matney,* 981

7 F.2d at 1019.  However, the Commissioner's decision "'cannot be affirmed simply by

8 isolating a specific quantum of supporting evidence.'"  *Tackett,* 180 F.3d at 1098 (*quoting*

9 *Sousa v. Callahan*, 143 F.3d 1240, 1243 (9th Cir.1998)).  Rather, the Court must "'consider

10 the record as a whole, weighing both evidence that supports and evidence that detracts from

11 the [Commissioner's] conclusion.'" *Id.* (*quoting Penny v. Sullivan*, 2 F.3d 953, 956 (9th Cir.

12 1993)).

13 **DISCUSSION**

14      SSA regulations require the ALJ to evaluate disability claims pursuant to a five-step

15 sequential process.  20 C.F.R. §§404.1520, 416.920.  To establish disability, the claimant

16 must show he has not worked since the alleged disability onset date, he has a severe

17 impairment, and his impairment meets or equals a listed impairment or his residual functional

18 capacity ("RFC")[1] precludes him from performing past work.  Where the claimant meets his

19 burden, the Commissioner must show that the claimant is able to perform other work, which

20 requires consideration of the claimant's RFC to perform other substantial gainful work in the

21 national economy in view of claimant's age, education, and work experience.

22 **THE ALJ'S REJECTION OF OPINION EVIDENCE**

23      The ALJ found that Plaintiff had the following severe impairments: psychotic disorder

24 not otherwise specified, mood disorder not otherwise specified, cognitive disorder, borderline

25 intellectual functioning, and status post left knee arthroscopy. (AR. 28).  She determined that

26

27         [1]RFC is defined as that which an individual can still do despite his or her limitations.

28 20 C.F.R. §§ 404.1545, 416.945.

1   Plaintiff had the RFC to perform medium work, "except that he can understand, remember,
2   and carry out simple one or two step instructions; he can relate and interact with supervisors
3   but cannot have contact with the public and co-workers; and he can maintain concentration
4   and attention for simple repetitive work." (AR. 31). Although the ALJ found that Plaintiff
5   was unable to perform his past relevant work as a painter, she determined that he could
6   perform work as a landscape worker and dishwasher. (AR. 36 (citing vocational expert's
7   testimony)).

8       In reaching her decision, the ALJ gave "little weight" to the opinion of Plaintiff's
9   treating doctors, Saul Perea, M.D., and Richard V. Barnes, M.D., both of whom treated
10  Plaintiff at Cope Behavioral Services, Inc. (AR. 34-35). The ALJ also gave "some weight"
11  to the opinion of licensed psychologist Noell Rohen, Ph.D., a consulting examiner. (AR. 34).
12  Plaintiff takes issue with the ALJ's assessment of these opinions.

13      It is well-settled that the opinions of treating physicians are entitled to greater weight
14  than the opinions of examining or non-examining physicians. *Andrews v. Shalala,* 53 F.3d
15  1035, 1040-1041 (9th Cir. 1995); *Magallanes v. Bowen,* 881 F.2d 747, 751 (9th Cir. 1989)
16  ("We afford greater weight to a treating physician's opinion because he is employed to cure
17  and has a greater opportunity to know and observe the patient as an individual."); *see also*
18  20 C.F.R §§ 404.1527, 416.927 (generally, more weight is given to treating sources). An
19  ALJ may reject a treating doctor's uncontradicted opinion only after giving "'clear and
20  convincing reasons' supported by substantial evidence in the record." *Reddick v. Chater,* 157
21  F.3d 715, 725 (9th Cir. 1998) (*quoting Lester v. Chater,* 81 F.3d 821, 830 (9th Cir. 1995)).
22  Additionally, "[a] treating physician's opinion on disability, even if controverted, can be
23  rejected only with specific and legitimate reasons supported by substantial evidence in the
24  record." *Id. See also Holohan v. Massanari,* 246 F.3d 1195, 1202-1203 (9th Cir. 2001).

25      Likewise, the opinion of an examining physician, such as Dr. Rohen, "is, in turn,
26  entitled to greater weight than the opinion of a nonexamining physician.... As is the case with
27  the opinion of a treating physician, the Commissioner must provide 'clear and convincing'
28  reasons for rejecting the uncontradicted opinion of an examining physician.... And like the

1   opinion of a treating doctor, the opinion of an examining doctor, even if contradicted by

2   another doctor, can only be rejected for specific and legitimate reasons that are supported by

3   substantial evidence in the record." *Lester,* 81 F.3d at 829-830.

4         The ALJ rejected Dr. Perea's opinions set out in his August and November 2006

5   Mental Impairment Reports. (AR. 34,534-37, 835-38). The context of Dr. Perea's treatment

6   relationship with Plaintiff appears to have its genesis on May 14, 2006 when police took

7   Plaintiff to the hospital after his mother called 911 because Plaintiff threatened to cut his

8   throat with a knife. (AR. 769). Plaintiff reported multiple suicide attempts one month prior,

9   and he reported auditory hallucinations of voices telling him to kill himself. (*Id.*). A urine

10  drug screen was positive for amphetamines, cocaine, and cannabinoid. (AR. 770). Diagnoses

11  included suicidal ideation, auditory hallucinations, and polysubstance abuse. (*Id.*).

12        On May 23, 2006, Plaintiff presented to COPE Behavioral Services for assistance with

13  auditory hallucinations and depression. (AR. 680-83). He reported that Risperdal and anti-

14  depression medication made the voices tolerable. (AR. 682). He had been taking Risperdal

15  for the voices and a medication for depression, but had been out of both for the last couple

16  days. (AR. 687). He had also been taking pain killers for shoulder pain. (AR 687-88).

17  Diagnoses were Unspecified Psychosis and combinations of drug dependence in remission.

18  (AR. 688)

19        On June 1, 2006, Plaintiff presented to Dr. Perea for a psychiatric examination

20  complaining of auditory hallucinations of multiple voices telling him to kill himself,

21  increased irritability, and problems sleeping. (AR. 730) ("As a consequence of his mood, he

22  has been arguing more with his girlfriend to the point of girlfriend pressing charges of

23  domestic violence."). He stated he is always thinking about suicide. (*Id.*). He reported being

24  high on crystal meth when he attempted to kill himself a few weeks before. (*Id.*). He

25  reported also using crack cocaine one-and-one-half years prior and cocaine six months prior,

26  as well. (*Id.*). He was exposed to heavy solvents and paint fumes in his work as a painter

27  for the past 20 years. (*Id.*). On mental status exam, Dr. Perea noted good hygiene, anxious

28  affect, anxious and mildly depressed mood, and that Plaintiff reported his   auditory

1   hallucinations were not as intense as before he started taking Risperdal.  (AR. 731).  Plaintiff

2   described his present hallucinations as mumbling, non-commandment, and he "claim[ed] to

3   be very distressed with those hallucinations...."  (*Id.*).  Dr. Perea found Plaintiff was coherent

4   and had good attention and concentration, grossly intact memory and cognition, average or

5   below intelligence, and his judgment and insight were impaired in terms of substance abuse

6   issues.  (*Id.*).  Dr. Perea diagnosed psychotic disorder NOS vs. substance-induced mood

7   disorder NOS vs substance-induced polysubstance dependence, including crack-cocaine,

8   methamphetamine, alcohol and possible industrial paint and solvents.  (*Id.*).  He also

9   identified severe psychosocial stressors including poor interpersonal relationships,

10  unemployment, financial issues, domestic violence issues, grief and loss family of origin

11  issues.  (*Id.*).  He assessed a GAF of 60.  (*Id.*).  Dr. Perea continued Plaintiff on Risperdal,

12  and Plaintiff agreed to enter substance abuse treatment.  (*Id.*).

13      On August 24, 2006, Dr. Perea noted that Plaintiff was clean and sober and his

14  auditory hallucinations were "much improved."  (AR. 658).  Dr. Perea's diagnosis was

15  psychosis NOS vs substance induced.  (*Id.*).  He continued Plaintiff on Risperdal.  (*Id.*).

16      On August 29, 2006, Dr. Perea completed a Mental Impairment Report indicating

17  Plaintiff's history of depression with psychosis and at least one suicide attempt. (AR 534).

18  He noted Plaintiff had been hospitalized several times at Kino Palo Verde Hospital and it was

19  unclear if his symptoms were related to his chemical dependency.  (*Id.*).  He noted that

20  Plaintiff's auditory hallucinations were decreasing in frequency and intensity.  (AR. 535).

21  Plaintiff's speech, and memory were within normal limits and he was not significantly

22  limited in most areas of understanding and memory, sustained concentration and persistence

23  (other than the ability to maintain attention and concentration for extended periods and the

24  ability to complete a normal workday and work week without interruptions from

25  psychologically based symptoms and to perform at a consistent pace), social interaction

26  (other than the ability to accept instructions and respond appropriately to criticism from

27  supervisors), and adaptation.  (AR. 536-37).  Dr. Perea's diagnosis was psychotic disorder

28  NOS.  (AR. 537).

1    On November 20, 2006, Dr. Perea completed another Mental Impairment Report

2 reflecting that Plaintiff's polysubstance abuse was in remission.  (AR. 835).  Dr. Perea

3 indicated that Plaintiff's memory was "fair abnormal",  Plaintiff was unable to process

4 detailed instructions, and the majority of his abilities to sustain concentration and persistence,

5 to maintain appropriate social interactions (accept instruction and respond appropriately to

6 criticism from supervisors and get along with co-workers), and to adapt, were limited to the

7 extent that they were "abnormal".  (AR. 835-37).  Dr. Perea cited Plaintiff's psychosis NOS

8 and the fact that Plaintiff was under acute pain treatment with narcotic medication.  (AR.

9 836, 838; *see also* AR. 876 (Dr. Perea noted on November 20, 2006 that Plaintiff had

10 recently been in a car accident, suffered neck strain and a concussion, and had been

11 prescribed Hydrocodone)).

12    The ALJ gave little weight to Dr. Perea's opinions.  (AR. 34).  She discounted his

13 November 2006 Mental Impairment Report because he "failed to adequately define the

14 extent to which [Plaintiff] is limited and is based upon a short treatment period of five

15 months." (*Id.*).  While it is true that Dr. Perea did not use words such as moderate or marked

16 to describe Plaintiff's limitations, it was Dr. Perea's medical opinion, after several months

17 of treatment, that Plaintiff was abnormal in the areas indicated.  The fact that Dr. Perea did

18 not "define the extent" of the limitation does not vitiate the fact that he found Plaintiff was

19 limited in the areas indicated.   Moreover, by this point, Dr. Perea had treated Plaintiff for

20 five months.  While the ALJ may consider the length of the treatment relationship, she

21 suggests no reason why Dr. Perea could not have reached these conclusions during five

22 months of treating Plaintiff.  While the ALJ has stated specific reasons for rejecting Dr.

23 Perea's November 2006 opinion, the stated reasons do not legitimately support attributing

24 little weight to Dr. Perea's opinion.

25    Less than one year later, in August 2007, Plaintiff's treating doctor at Cope, Richard

26 Barnes, M.D., indicated Plaintiff was not significantly limited and/or that Dr. Barnes was

27 "uncertain" as to Plaintiff's abilities in many areas, and that Plaintiff was mildly limited in

28 the abilities to perform activities within a schedule, maintain regular attendance, be punctual,

and set realistic goals and to make plans independently of others. (AR. 1039-42). Dr. Barnes did not feel the limitations had lasted 12 months or would be expected to last 12 months. (AR. 1041). Dr. Barnes also wrote that he had seen Plaintiff only two times at this point, Plaintiff denied psychotic symptoms, and he had "no knowledge in large part whether [Plaintiff] could function in a work environment. Thus, this is the reason for so many uncertain answers." (AR. 1042). He also noted Plaintiff had been noncompliant with treatment for approximately 8 months prior to seeing Dr. Barnes. (*Id.*).

COPE notes from September 20, 2007 show Plaintiff reported hearing voices and "doing as good as he can." (AR. 1266). On October 17, 2007, he reported hearing voices and depression that caused him not to get out of bed, despite being medication compliant. (AR. 1263). At a October 22, 2007 appointment, he spoke about anger issues and "get[ting] into fights with others all the time....[Plaintiff] states that he also hears 'voices' all the time and have increased lately and its getting worse...." (AR. 1261). Plaintiff also reported fighting with his brother resulting in his brother going to the emergency room. (*Id.*). Plaintiff's speech was incoherent and disorganized and he indicated "'he doesn't care anymore about anything.'" (*Id.*; *see also* (AR. 1260 (October 22, 2007 note referring Plaintiff to anger management due to "out-of-control outbursts....")). Also, on October 22, 2007, Plaintiff informed Dr. Barnes that he had been getting into physical fights with family members, he "'ripped his [brother's] face open'", "he has been more and more angry" and "'can't seem to control myself.'" (AR. 1133). He told Dr. Barnes that he heard voices and that he felt hopeless. (*Id.*). Dr. Barnes diagnosed psychotic disorder NOS and polysubstance dependence. (*Id.*). He continued Plaintiff on Abilify. (*Id.*).

In an undated mental impairment assessment, with a "Received" stamp date of October 24, 2007, Dr. Barnes noted that Plaintiff was: markedly limited in the abilities to make simple work-related decisions, to complete a normal workday and work week without interruptions from psychologically based symptoms, to maintain socially appropriate behavior, to travel in unfamiliar places or to use public transportation, and to set realistic goals; moderately limited in the abilities to remember work procedures, understand simple

instructions, understand and carry out detailed instructions, sustain an ordinary work routine without special supervision, work in combination or proximity with others, interact with the public appropriately, ask simple question, accept instructions and to respond appropriately to criticism from supervisors,  get along with co-workers, respond appropriately to changes at work, and to be aware of normal hazards; and mildly limited in the abilities to carry out simple instructions, maintain attention, and to perform activities within a schedule.  (AR. 1043-45).  Dr. Barnes indicated that the limitations had lasted 12 months or would be expected to last 12 continuous months.  (AR. 1045).  Other than stating, "please see previously filed report", Dr. Barnes provided no basis for his decision.  (AR. 1046).  Later, in March 2008, Dr. Barnes completed a seriously mentally ill determination wherein he indicated that Plaintiff's personality disorder "cause[d] significant damage to...[Plaintiff's] education, livelihood, career, or personal relationships,"' Plaintiff performed significantly below expectations for cognitive/developmental level, was unable to work, attend school or meet other developmentally appropriate responsibilities, and there was "[a] qualifying diagnosis with probable chronic, relapsing and remitting course."  (AR. 1150-51).

The ALJ rejected Dr. Barnes second assessment with the "Received"  stamp date of October 24, 2007, because it was undated, there was no objective evidence to support the findings, Dr. Barnes' August assessment reflected that he was unable to determine Plaintiff's ability to function in a work environment, Plaintiff had not exhibited psychotic symptoms, and he had been non-compliant in the past.  (AR. 34-35).

Plaintiff persuasively argues that Dr. Barnes second assessment may have been based on information that was not available when he completed the earlier assessment in August, 2007. (Reply, p. 4). The "Received" stamp date of October 24, 2007 supports the conclusion that it was completed after the August 2007 assessment.  By October 2007, COPE notes showed that Plaintiff appeared compliant on medication since the August 2007 assessment and was complaining of depression, out-of-control anger issues, and hearing voices.  Thus, contrary to the ALJ's position, objective evidence in the record supported Dr. Barnes' opinion that differed from his August 2007 assessment.

1       Many of the areas of limitation identified by Drs. Perea and Barnes are  largely
2   consistent with examining Dr. Rohen's opinion to which the ALJ accorded "some weight...."
3   (AR 34).  In November 2007, Plaintiff told Dr. Rohen that he heard whispers every day
4   "calling him a witch, telling him he has special powers to stop evil people...the voices have
5   different ideas and work against each other in his head, which confuses him and makes it
6   difficult for him to concentrate." (AR 1059).  He also reported "feeling violent, getting into
7   fights."  (*Id.*).  He reported that his last job, which was over two years ago, "ended afer he
8   had three physical fights with other crew bosses."  (AR. 1060 (he had worked on and off as
9   a painter for the company for 20 years)).  He had been in a fight two weeks before his
10  appointment with Dr. Rohen when he attacked a man he thought was attempting to harm him.
11  (AR. 1069) Dr. Rohen observed that Plaintiff's "[r]ight hand was visibly swollen, reportedly
12  broken when he put his hand into a wall in a fit of anger."  (AR. 1060).  Plaintiff told Dr.
13  Rohen he was homeless and, although he sometimes stayed with friends, he is most often on
14  the street.  (*Id.; see also id* ("On the street, he avoids most other homeless men because he
15  tends to get into fights.")).

16      Testing scores showed Plaintiff's IQ was 65, placing him in the extremely low range
17  of intellectual functioning, which Dr. Rohen found was consistent with Plaintiff's report of
18  special education placement at school.  (AR. 1063).  Memory function as measured by the
19  WMS-III was "quite poor." (AR. 1063).  Plaintiff "was overwhelmed by [the WMS-III] cried
20  through it, and some tasks just seemed too difficult for him.  The Verbal Paired Associates
21  task was discontinued when it became evident that claimant's emotional response was
22  precluding his attending to these items....Composites that were calculated suggested
23  considerable impairment."  (*Id.*).  Results on Trail-Making Tests Parts A and B suggested
24  difficulties in processing speed, attention, and cognitive flexibility.  (AR. 1064).  Dr. Rohen
25  did not suspect malingering.  (AR. 1062).

26      Dr. Rohen's diagnoses included: Psychotic Disorder NOS, Mood Disorder NOS,
27  Polysubstance Dependence in Sustained Full Remission (no use reported since 5/06), rule
28  out Cognitive Disorder Nos, and rule out Borderline Intellectual Functioning. (AR. 1064).

1    Dr. Rohen noted that with regard to possible cognitive limitations and borderline intellectual

2    functioning: "the fact that his difficulties look more severe upon formal testing than might

3    have been expected is considered to be related to the impact of anxiety and depression (and

4    possibly psychosis) on effort and focus." (*Id.*).  Dr. Rohen's impression was that Plaintiff

5    "enjoyed his work and would return if he could–he has maintained employment for most of

6    his life, even through polysubstance dependence.  At this time, his constellation of

7    difficulties has resulted in homelessness, and he presents as distracted, emotional, agitated,

8    irritable, with difficulty expressing himself and maintaining appropriate attentiveness.  It is

9    possible that he will stabilize again, but if so, stabilization will be followed eventually by

10    decompensation, as that has been his pattern." (*Id.*).

11        Dr. Rohen opined that Plaintiff had the following limitations:  mild limitations in the

12    understanding and carrying out simple instructions, making simple work-related decisions

13    and interacting appropriately with the public; moderate limitations in interacting

14    appropriately with supervisors and responding appropriately to usual work situations and

15    changes in a routine work setting; and marked limitations in understanding and carrying out

16    complex instructions, making complex work-related decisions and interacting appropriately

17    with co-workers. (AR. 1067-68). She further stated that Plaintiff's psychiatric factors impair

18    his ability to be consistent with appointments and provide for basic needs, including shelter.

19    (AR. 1068).  She believed that Plaintiff had been so limited since "probably 2 years ago", *ie*

20    2005.  (*Id.*).

21        The ALJ gave "some weight" to Dr. Rohen's opinion, finding the Doctor's

22    "observations are fairly consistent with the overall evidence." (AR. 34). The ALJ departed

23    from Dr. Rohen's finding regarding mild limitations interacting with the public and, instead

24    found that "the evidence supports limiting claimant's interact [sic] with the public based

25    upon his difficulty with anger and history of conflict with others." (*Id.*).  The substantial

26    evidence of record supports the ALJ's departure from Dr. Rohen's findings with regard to

27    Plaintiff's ability to interact with co-workers or the public.

28

However, it is troubling that although Dr. Rohen found that Plaintiff was limited in his ability to interact appropriately with supervisors, (AR.1068; *see also* AR. 837, 1045 (Drs. Perea and Barnes also found Plaintiff was limited in this area), the ALJ's RFC assessment included that Plaintiff "can relate and interact with supervisors...." (AR. 31). This finding is not supported by substantial evidence of record.  Nothing in the record supports the conclusion that Plaintiff's anger issues are limited solely to co-workers or members of the public.  (*See e.g.,* AR. 1060 (Plaintiff reported to Dr. Rohen that his employment ended after he had three physical fights with other crew bosses); *see also* AR 1061, 1133 (Plaintiff reported injuring his brother during a fight); AR.531 (Plaintiff's mother reported that he tries to get along with authority figures, "but not very well"); AR. 1276 (Plaintiff reported hearing voices that call him names, talk to one another, and tell him to hurt people; and, he jumped a man because he thought the man was threatening him); AR. 403 (Plaintiff reported he does not get along well with authority figures, "I've had bad experiences with them [and] I usually make a bad remark to them"); AR. 1133, 1268 (Plaintiff has been hospitalized for fighting with his brother and, on one occasion, "ripped" his brother's face open causing his brother to go to the ER); AR 1260-61 (Plaintiff reported out-of-control anger issues); AR. 1283 (Plaintiff reported getting into arguments with his girlfriend because he thinks she is talking about him)).  Similarly, Dr. Rohen, in addition to Drs. Perea and Barnes found Plaintiff was limited in his ability to adapt to changes in a routine work setting and to be consistent with schedules.  (AR. 1068 (Dr. Rohen); AR. 1044 (Dr. Barnes); AR. 837-38 (Dr. Perea)).[2]  Yet,

_____

[2]At the hearing, the VE was asked to consider a hypothetical person consistent with the ALJ's RFC assessment which the VE described as "medium work; simple one-to-two step instructions; avoiding public contact, coworkers; and simple, repetitive work...." (AR. 130). The VE testified that such person with Plaintiff's background could work as a landscape worker or dishwasher.  (AR. 131).  When the VE was asked to add to the hypothetical: "the inability to work in coordination or proximity to others; unable to interact appropriately with supervisors; be punctual within customary tolerances; and travel to unfamiliar places", the VE testified that: "...if he couldn't be punctual for work, then it's not a competitive job."  (AR. 133-34).  Despite the fact that the VE originally testified that someone with Plaintiff's RFC, who must "avoid...public contact, coworkers..." could work

the ALJ did not specifically reject Dr. Rohen's conclusion, nor did she include this limitation in her hypothetical to the VE or in the RFC assessment. "[W]hile an [ALJ] is free to resolve issue of credibility as to lay testimony or to choose between properly submitted medical opinions, he is not free to set  his own expertise against that of a physician who [submitted an opinion to or] testified before him." *McBrayer v. Secretary of Health & Human Servs.,* 712 F.2d 795, 799 (2d Cir. 1983); *see also Tackett,* 180 F.3d at 1102-03 (ALJ improperly relied on his interpretation of Plaintiff's testimony over medical opinions); *Gonzalez Perez v. Health & Human Servs,* 812 F.2d 747, 749 (1st Cir. 1987) ("The ALJ may not substitute his own layman's opinion for the findings and opinion of a physician...."). On the instant record, the ALJ's omission of limitations on Plaintiff's ability to work with supervisors and to maintain schedules, without properly rejecting Dr. Rohen's opinion, as well as Dr. Barnes' and Dr. Perea's opinions, imposing such limitations was erroneous.

In his Reply, Plaintiff suggests that Dr. Rohen's evaluation appears to show he met Listing 12.05(C), addressing mental retardation.[3]  (Reply, p. 2).  In finding that Plaintiff did not meet listing 12.05(C) the ALJ stated that Plaintiff did not have a valid verbal, performance, or full scare IQ of 60 through 70 and a physical or other mental impairment imposing an additional significant work-related limitation or function. (AR. 30-31). To the contrary, Dr. Rohen assessed a full-scale IQ of 65(AR. 1063) and the ALJ did not

as a landscaper or dishwasher (AR. 131-32), she later testified that if Plaintiff was unable to interact with coworkers to a marked degree, he "may be able"... to work as a landscaper, but that job would have a problem with competitive levels of functioning.  (AR. 135).

[3]A claimant satisfies Listing 12.05(C), where the evidence demonstrates or supports onset of the impairment before the age of 22 and the claimant has "[a] valid verbal, performance, or full scale IQ of 60 to 69 inclusive and a physical or other mental impairment imposing additional and significant work-related limitation of function[.]"  20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.05(C).  An impairment and imposes "an additional and significant work-related limitation of function" when its impact on a claimant's ability to perform basic work activities is more than slight or minimal. *Fanning v. Bowen,* 827 F.2d 631, 633 (9th Cir. 1987) (internal citations omitted). A step two finding of a severe impairment by the ALJ therefore satisfies this test. *Id.* at n. 3 (emphasizing, however, that a specific severity finding is not required to satisfy this standard).

1    specifically reject this finding. Yet, to fall within 12.05(C), the evidence must demonstrate

2    an onset before the age of 22. Given that the Magistrate Judge recommends remand for an

3    award of benefits, further development of whether Plaintiff meets Listing 12.05(C) is not

4    necessary.  However, in the event the District Court may determine that remand for further

5    proceedings is appropriate instead of an award of benefits, then any further proceedings

6    should also include consideration of whether Plaintiff meets Listing 12.05(C).

7        Plaintiff also challenges the ALJ's rejection of COPE Nurse Practitioner Pat Joyce's

8    July 2009 assessment that Plaintiff would be seriously limited and/or unable to meet

9    competitive standards in many areas including maintaining regular attendance and being

10   punctual, responding appropriately to supervisors, getting along with co-workers or the

11   public, and understanding and carrying out detailed instructions.  (AR. 1073-77).  NP Joyce

12   cited chronic auditory hallucinations, irritable mood, "can't get along [with] others",

13   depression, and "possible cognitive [illegible]."  (AR. 1073, 1076-77).  The ALJ gave no

14   weight to NP Joyce's assessment because she was not an acceptable medical source and her

15   assessment was inconsistent with treatment notes, GAF scores of 55-60, indicating moderate

16   limitations, and Plaintiff's daily activities of living.  (AR. 35).  Even though a nurse

17   practitioner is not considered an acceptable medical source,  the ALJ may only discount NP

18   Joyce's testimony by giving reasons germane to her testimony for doing so.  *Molina v.*

19   *Astrue,* 674  F.3d 1104, 1111 (9th Cir. 2012).  NP Joyce's assessment is largely consistent

20   with Dr. Rohen's, Perea's and Barnes' opinions.  Further, the ALJ has cited nothing about

21   Plaintiff's activities of daily living that contradict NP Joyce's assessment.  The substantial

22   evidence of record does not support the wholesale rejection of NP Joyce's assessment.

23       The ALJ also rejected lay statements from Plaintiff's mother and girlfriend  about

24   such things as Plaintiff's anger issues, inability to read, comprehend and concentrate,

25   inability to get along with others, talking to himself, and depression.  (AR. 35; *see also* AR.

26   525-32 (mother); AR. 845-52 (girlfriend)).  The ALJ rejected the lay reports "[b]ecause of

27   the [witnesses'] relationship with the clamant, the testimony would tend to show a bias in his

28   favor...."  (*Id.*).  She found the statements partially credible to the extent that they show

1   Plaintiff "is able to perform a variety of activities, including housework, seeing his daughter,

2   attending appointments, and tending to his personal care needs...." (*Id.*).  Lay testimony as

3   to a claimant's symptoms is competent evidence which the ALJ must take into account unless

4   she expressly determined to disregard such testimony, in which case she must give reasons

5   that are germane to each witness. *Nguyen v. Chater*, 100 F.3d 1462, 1467 (9th Cir.  1996)

6   (citing *Dodrill v. Shalala*, 12 F.3d 915, 919 (9th Cir. 1993)).  In finding error when an ALJ

7   rejected lay testimony from family witnesses because they were "'understandably advocates,

8   and biased'", the Ninth Circuit stated that "the same could be said of any family member who

9   testified in any case.  The fact that a lay witness is a family member cannot be a ground for

10  rejecting his or her testimony.  To the contrary, testimony from lay witnesses who see the

11  claimant every day is of particular value, *see Dodrill,* 12 F.3d at 919, ('[a]n eyewitness can

12  often tell whether someone is suffering or merely malingering...this is particularly true of

13  witnesses who view the claimant on a daily basis...'); such lay witnesses will often be family

14  members." *Smolen v. Chater,* 80 F.3d 1273, 1289 (9th Cir. 1996).  *See also Regennitter v.*

15  *Commissioner of Social Security Admin.,* 166 F.3d 1294, 1298 (9th Cir. 1999) (same).

16  Further, the ALJ never discussed testimony from Plaintiff's brother at the December 2010

17  hearing.  (AR. 112-124). The ALJ improperly rejected the lay statements.

18  **THE ALJ'S CREDIBILITY ASSESSMENT**

19       Plaintiff also takes issue with the ALJ 's finding that although Plaintiff's impairments

20  could reasonably be expected to cause the symptoms he complained of, his statements

21  concerning the intensity, persistence, and limiting effects of the symptoms were not entirely

22  credible.  (AR. 31).  The ALJ pointed out that during periods of treatment compliance,

23  Plaintiff's symptoms improved, his GAF scores typically fell within the ranges of 51-60

24  indicating moderate symptoms, and he was  able to take care of himself.  (AR. 31-32).

25       When assessing a claimant's credibility, the "ALJ is not required to believe every

26  allegation of disabling pain or other non-exertional impairment." *Orn v. Astrue,* 495 F.3d

27  625, 635 (9th Cir. 2007) (internal quotation marks and citation omitted). However, where, as

28  here, the claimant has produced objective medical evidence of an underlying impairment that

could reasonably give rise to the symptoms and there is no affirmative finding of malingering, the ALJ's reasons for rejecting the claimant's symptom testimony must be clear and convincing.[4]   *Carmickle v. Commissioner, Social Security Admin.,* 533 F.3d 1155, 1160-61 (9th Cir. 2008) ("We have consistently held that where the record includes objective medical evidence establishing that the claimant suffers from an impairment that could

---

[4]Defendant argues that the "clear and convincing reasons" standard for discounting credibility exceeds that required in *Bunnell v. Sullivan,* 947 F.2d 341, 345-346 (9th Cir.1991) (*en banc*) where the Ninth Circuit stated that an ALJ's credibility findings must be supported by the record and "'must be sufficiently specific to allow a reviewing court to conclude the adjudicator rejected the claimant's testimony on permissible grounds and did not arbitrarily discredit a claimant's testimony regarding pain.'" (Defendant's Brief, pp.18-19 n.9 (*quoting Bunnell,* 947 F.2d at 345-346 (internal quotation marks and citations omitted)). Defendant's position is unavailing.  First, "a requirement of 'clear and convincing reasons' is distinct from a clear [and] convincing evidentiary standard. *Cf. Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir.2005) ('To reject an uncontradicted opinion of a treating or examining doctor, an ALJ must state clear and convincing reasons that are supported by substantial evidence.' ...)."  *Provencio v. Astrue,* 2012 WL 2344072, *11 n. 5 (D.Ariz. June 20, 2012). Second, as Defendant points out, *Bunnell* itself requires that the ALJ "specifically make findings..." that are supported by the record, to support the conclusion that the claimant's allegations of severity are not credible.  *Bunnell*, 947 F.2d at 345.  Further, these findings must be "sufficiently specific to allow a reviewing court to conclude that the..." ALJ rejected the testimony on permissible grounds.  *Id.* at 345-346.  The District Court for the District of Arizona has noted that "[s]ubsequent cases have explained that 'unless an ALJ makes a finding of malingering based on affirmative evidence thereof, he or she may only find an applicant not credible by making specific findings as to credibility and stating clear and convincing reasons for each.' *Robbins v. Soc. Sec. Admin*., 466 F.3d 880, 883 (9th Cir.2006) (emphasis added); see also *Lingenfelter v. Astrue*, 504 F.3d 102[8], 1036 (9th Cir.2007). Thus, the cases applying the 'clear and convincing' standard in no way overturn *Bunnell*. Numerous cases have applied the 'clear and convincing' standard, and this Court is in no position to overrule them. *See, e.g., Taylor v. Comm'r of Soc. Sec. Admin*., [659 F.3d] 1228, 1234 (9th Cir.2011); *Vasquez v. Astrue*, 572 F.3d...[586, 591 (9th Cir. 2009)]; *Lingenfelter,* 504 F.3d at 1036; *Orn*, 495 F.3d at 635; *Robbins*, 466 F.3d at 883; *Smolen,* 80 F.3d at 1281; *Dodrill*, 12 F.3d at 918." *Provencio,* 2012 WL 2344072 at *11 n.5.  Moreover, as discussed below, although the ALJ set forth specific  reasons for rejecting Plaintiff's credibility, those reasons are not permissible and/or supported by the record.  Thus, the ALJ's credibility finding fails under Defendant's proposed standard as well as the "clear and convincing reasons" standard.

reasonably produce the symptoms of which he complains, an adverse credibility finding must be based on 'clear and convincing reasons[]'" unless there is affirmative evidence of malingering); *Tommasetti*, 533 F.3d at 1040; *Orn*, 495 F.3d at 635*; Robbins,* 466 F.3d at 883. "The ALJ must state specifically which symptom testimony is not credible and what facts in the record lead to that conclusion." *Smolen,* 80 F.3d at 1284; *see also Orn,* 495 F.3d at 635 (the ALJ must provide cogent reasons for the disbelief and cite the reasons why the testimony is unpersuasive). In assessing the claimant's credibility, the ALJ may consider ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements about the symptoms, and other testimony from the claimant that appears less than candid; unexplained or inadequately explained failure to seek or follow a prescribed course of treatment; the claimant's daily activities; the claimant's work record; observations of treating and examining physicians and other third parties; precipitating and aggravating factors; and  functional restrictions caused by the symptoms. *Lingenfelter,* 504 F.3d at 1040;  *Robbins,* 466 F.3d at 884; *Smolen,* 80 F.3d at 1284.

Plaintiff's testimony and medical records consistently reflect that he hears voices that make him violent and want to hurt himself and others, and make it difficult for him to concentrate on work.  (AR. 61, 390, 410, 1261, 1263-64, 1266, 1276, 1283).  Plaintiff testified: "I know people are talking about me everywhere....They follow me...no matter where I go, they're there.  I just try to get away from it as much as possible because they just won't leave me alone." (AR. 110-11).  He believes he has special powers to fight evil  (AR. 84, 1283; *see also* AR. 1241(COPE note that Plaintiff may be delusional based on report he has been "drained out due to dealing with evil spirits.' [Plaintiff] reports that these spirits are real and that they try to hurt people.")).  He is homeless and lives in the desert, staying with friends when he can and stopping by his brother's.  (AR. 99 (he had stayed with his brother for a time until he broke his brother's nose and was made to leave); *see also* AR 32 (ALJ

1   acknowledging Plaintiff is homeless[5])).   As the ALJ points out, the record does reflect
2   periods of Plaintiff's non-compliance with treatment.   However, the ALJ's reliance on
3   Plaintiff's comments at various times that medication resulted in a "decrease in auditory
4   hallucinations, often making the voices 'tolerable'..." and has increased his appetite and sleep
5   (AR. 32) is of little value given that the record is replete with Plaintiff's continued
6   complaints of depression and auditory hallucinations, even when taking medication.   Such
7   comments about improvement "must be read in context of the overall diagnostic picture...."
8   *Holohan,* 246 F.3d at 1205.   That a person who suffers from severe psychiatric issues
9   "makes some improvement does not mean that the person's impairments no longer seriously
10  affect [his] ability to function in a workplace."   *Id.*   Nor do the records cited by the ALJ
11  necessarily support the ALJ's conclusion that medication manages Plaintiff symptoms in
12  such a way as to render him able to function in the workplace   when those records are
13  considered in context or considered on the record as a whole.

14      In rejecting Plaintiff's credibility, the ALJ stated on more than one occasion that
15  Plaintiff had been able to maintain employment in the past despite cognitive limitations and
16  claims of inability to maintain concentration, persistence and pace.   (AR. 33).   "[T]he fact
17  that a person holds down a job doesn't prove that he isn't disabled, because he may have a
18  careless or indulgent employer or be working beyond his capacity out of desperation."
19  *Henderson v. Barnhart,* 349 F.3d 434, 435 (7th Cir.2003).   Further, the ALJ's observation that
20  Plaintiff was able to graduate from high school, omits the fact that he did so while placed in
21  special education classes.

22      The ALJ also pointed out that Plaintiff cleans his brother's yard, has been seen
23

24      [5]To attack Plaintiff's credibility, Defendant points to instances where Plaintiff
25  reported to COPE providers that he had stayed with friends or at his brother's, thus he did
    not sleep in the desert.   (Response Brief, p. 21).   The ALJ did not cite the fact that Plaintiff
26  stayed with friends or his brother as a reason to reject his credibility.   *See Connett,* 340 F.3d
27  at 874 (the court cannot affirm the ALJ's credibility finding based upon evidence that the
    ALJ did not discuss). The record is clear, and the ALJ acknowledges, that Plaintiff was
28  homeless.

1   digging in his brother's yard, is able to walk or hitchhike to various places for food and to

2   take a shower, and is able to obtain food from the food bank.  (AR. 33).  Nothing about these

3   abilities signifies that Plaintiff spends a *substantial* part of his day engaged in pursuits

4   involving the performance of functions that are transferrable to a work setting.  *See Fair v.*

5   *Bowen,* 885 F.2d 597, 603 (9th Cir. 1989); *see also Vick v. Comm'r. of  Soc. Sec.,* 57

6   F.Supp.2d 1077, 1086 (D. Or. 1999) ("If claimant's activity is in harmony with her [or his]

7   disability, the activity does not necessarily indicate an ability to work.")).  Moreover, the

8   cited activities are not inconsistent with Plaintiff's limitations, including his inability to get

9   along with co-workers, the public, and supervisors.

10          The ALJ also found that Plaintiff "denied..." going to the casino with his mother and

11   working out at the gym.  (AR. 33).  In June 2010, Plaintiff told COPE Dr. Krasevic that he

12   "[l]ikes to go to the casino with his mother.....Likes to go to the gym."  (AR. 1142).  At the

13   December 1, 2010 hearing, the ALJ asked Plaintiff whether he went to the casino with his

14   mother, to which he replied: "No, a couple of times and they–I got–they threw me out

15   because people were talking about me....[M]y mom doesn't take me anywhere with her no

16   more."  (AR. 111).  He also stated he did not go to the gym earlier that year: "No ma'am.

17   My mom tried to get me into getting into the gym, but I just can't be around people."  (*Id.*).

18   That he "likes" going to the gym is not the same as actually going to the gym.

19          In sum, the substantial evidence of record, when viewed as a whole, does not support

20   the ALJ's cited reasons discounting Plaintiff's subjective complaints by neither specific and

21   legitimate reasons, nor clear and convincing evidence.

22   **REMAND FOR AN IMMEDIATE AWARD OF BENEFITS**

23          Plaintiff requests that the Court grant benefits or, alternatively, remand for further

24   proceedings.  (Reply, p. 5).  "'[T]he decision whether to remand the case for additional

25   evidence or simply to award benefits is within the discretion of the court.'"  *Rodriguez v.*

26   *Bowen,* 876 F.2d 759, 763 (9th Cir. 1989) (*quoting Stone v. Heckler,* 761 F.2d 530, 533 (9th

27   Cir. 1985)).  "Remand for further administrative proceedings is appropriate if enhancement

28

of the record would be useful."   *Benecke v. Barnhart,* 379 F.3d 587, 593, (9th Cir. 2004)

(*citing Harman v. Apfel,* 211 F.3d 1172, 1178 (9th Cir. 2000)).   Conversely, remand for an

award of benefits is appropriate where:

> (1) the ALJ failed to provide legally sufficient reasons for rejecting the evidence; (2) there are no outstanding issues that must be resolved before a determination of disability can be made; and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited.

*Id.* at 593(citations omitted).   Where the test is met, "we will not remand solely to allow the

ALJ to make specific findings....Rather, we take the relevant testimony to be established as

true and remand for an award of benefits."   *Id.* (citations omitted).

Here, remand for an immediate award of benefits is appropriate. On the instant

record, the ALJ failed to provide adequate reasons for ignoring limitations found by treating

Doctors Perea and Barnes and examining Dr. Rohen, and she improperly rejected opinion

testimony from NP Joyce and Plaintiff's lay witnesses, as well as Plaintiff's own testimony.

The substantial evidence of record overwhelmingly supports the conclusion that Plaintiff

must not only avoid co-workers and the public as the ALJ found, but that his ability to

interact appropriately with supervisors and to maintain a regular schedule is also limited.

Plaintiff cannot work safely in the workplace.  Moreover, Plaintiff's application for benefits

has been pending for over seven years.   The ALJ has already reconsidered Plaintiff's case

once upon remand from the Appeals Council.   The Ninth Circuit has recognized that

"[r]emanding a disability claim for further proceedings can delay much needed income for

claimants who are unable to work and are entitled to benefits, often subjecting them to

'tremendous financial difficulties while awaiting the outcome of their appeals and

proceedings on remand.'"  *Benecke,* 379 F.3d at 595 (*quoting Varney v. Secretary of Health

and Human Services,* 859 F.2d 1396, 1398 (9th Cir. 1988)); *see also Terry v. Sullivan,* 903

F.2d 1273 (9th Cir. 1990) (remanding for an award of benefits where the plaintiff applied

almost four years prior); *Erickson v. Shalala,* 9 F.3d 813 (9th Cir. 1993) (remanding for an

award of benefits where plaintiff, who was disabled under the Act, "ha[d] been waiting for

1  well over four years for his disability benefits").   On the instant record, "remanding for

2  further administrative proceedings would serve no useful purpose and would unnecessarily

3  extend...[Plaintiff's] long wait for benefits." *Benecke*, 379 F.3d at 595. *See also Regennitter,*

4  166 F.3d at 1300 (where the court "conclude[s] that...a doctor's opinion should have been

5  credited and, if credited, would have led to a finding of eligibility, we may order the payment

6  of benefits."); *Pitzer v. Sullivan*, 908 F.2d 502, 506 (9th Cir.1990) (remanding for payment

7  of benefits where the Secretary did not provide adequate reasons for disregarding examining

8  physician's opinion); *Winans v. Bowen,* 853 F.2d 643, 647 (9th Cir. 1987).  (same).

9  **RECOMMENDATION**

10  For the foregoing reasons, the Magistrate Judge recommends that the District Court,

11  after its independent review, remand this matter for an immediate award of benefits.

12  Pursuant to 28 U.S.C. §636(b) and Rule 72(b)(2) of the Federal Rules of Civil

13  Procedure and LRCiv 7.2(e), Rules of Practice of the U.S. District Court for the District of

14  Arizona, any party may serve and file written objections within fourteen (14) days after being

15  served with a copy of this Report and Recommendation.  A party may respond to another

16  party's objections within fourteen (14) days after being served with a copy. Fed.R.Civ.P.

17  72(b)(2).  No replies to objections shall be filed unless leave is granted from the district court

18  to do so. If objections are filed, the parties should use the following case number: **CV12-768-**

19  **TUC-CKJ.**

20  Failure to file timely objections to any factual or legal determination of the Magistrate

21  Judge may be deemed a waiver of the party's right to *de novo* review of the issues.  *See*

22  *United States v. Reyna-Tapia,* 328 F.3d 1114, 1121 (9th Cir.) (*en banc*), *cert. denied,* 540 U.S.

23  900 (2003).

24  DATED this 14th day of February, 2014.

**CHARLES R. PYLE**
**UNITED STATES MAGISTRATE JUDGE**